```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                            :
INTER-AMERICAN DEVELOPMENT BANK and OPEC                    :
FUND FOR INTERNATIONAL DEVELOPMENT,                         :     16 Civ. 9782 (PAE)
                                                            :
                                    Plaintiffs,             :     OPINION & ORDER
                                                            :
                        -v-                                 :
                                                            :
IIG TRADE OPPORTUNITIES FUND N.V.,                          :
                                                            :
                                    Defendant.              :
                                                            :
------------------------------------------------------------X
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 12/4/17

PAUL A. ENGELMAYER, District Judge:

This case involves an attempt to recover based on two contractual guarantees. Plaintiffs Inter-American Development Bank ("IDB") and OPEC Fund for International Development ("OFID") (collectively, "the Banks") bring the instant action against defendant IIG Trade Opportunities Fund N.V. ("IIG") to collect the balance owed to them by their borrower, TOF Cayman SPV ("SPV"). The basis for plaintiffs' lawsuit are unconditional guarantees that IIG executed in favor of the Banks on the loans taken out by SPV. Pending now is the Banks' motion to dismiss all of IIG's counterclaims and to strike all of IIG's affirmative defenses. For the reasons set forth below, the Court grants the motion as to IIG's counterclaims of promissory estoppel, fraudulent inducement, and negligent misrepresentation—the latter two of which IIG had agreed to drop—and to all of IIG's affirmative defenses save one.

## I. Background[1]

### A. The Parties

IDB is an international organization and bank, established pursuant to a 48-country multilateral agreement. Its purpose is to "further, through its financing activities, the economic and social development of Latin America and the Caribbean by promoting environmentally sustainable growth, as well as the reduction of poverty and the increase of social equity." Compl. at 1.

OFID, is also an international organization, established by the member states of the Organization of the Petroleum Exporting Countries ("OPEC"). Its mission is to "reinforce financial cooperation between OPEC member countries and other developing countries and to promote South-South solidarity." *Id.* at 2.

IIG is a private investment fund created to provide trade financing in Latin America. *Id.*

Non-party SPV is a special purpose vehicle and wholly-owned subsidiary of IIG. *Id.*[2]

---

[1] The facts are drawn from the Complaint, Dkt. 1 ("Compl."); the Amended Answer, Affirmative Defenses, and Counterclaims, Dkt. 21 ("Amend. Answer"); the Declaration of David Daniels and accompanying exhibits, Dkt. 36 ("Daniels Decl."); the Declaration of Robert S. Landy and accompanying exhibits, Dkt. 38 ("Landy Decl."); and the Supplemental Declaration of Stephanie Tsay and accompanying exhibits, Dkt. 40 ("Tsay Decl."). For the purposes of resolving the motion to dismiss defendants' counterclaims and defenses, the Court considers all well-pled facts in the Amended Answer, drawing all reasonable inferences in IIG's favor, as well as any facts in the Complaint that IIG admits. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012); *JP Morgan Chase Bank, N.A. v. Reifler*, No. 11 CIV. 4016 (DAB), 2012 WL 12925172, at *1 (S.D.N.Y. Sept. 5, 2012). The Court also relies on the documents incorporated by reference into the Complaint and the Amended Answer, and the documents integral to these pleadings, *i.e.*, those which these pleadings rely "heavily upon in [their] terms and effect." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).

[2] Defendant's Amended Answer appears to use "IIG" as a blanket term to describe the actions of both IIG and SPV. Where the pleadings permit, the Court, in reciting the facts, distinguishes between these two entities, but as to certain particulars as to which the Amended Answer is imprecise, the Court of necessity refers to IIG and SPV collectively as IIG.

B.  **Factual Background**

1.  **May 2006: The IDB-SPV Credit Facility and IDB-IIG Guarantee**

On May 3, 2006, IDB established a $75 million credit facility for SPV (hereinafter "IDB-SPV Loan Agreement"). *See* Amend. Answer at 17; Daniels Decl. Ex. C (IDB-SPV Loan Agreement) at 1–2. Under the terms of the IDB-SPV Loan Agreement, the principal was due in full on the "first interest payment date following the fifth (5th) anniversary of the date of this agreement," or May 15, 2011. *See* IDB-SPV Loan Agreement at 14, 15, 28.

Also on May 15, 2017, IDB and IIG executed a guarantee agreement (hereinafter "IDB-IIG Guarantee"), in which IIG "irrevocably, absolutely and unconditionally guarantees to IDB . . . the due and punctual payment of the outstanding principal amount of the Revolving Credit Facility made by IDB to [SPV] . . . when due, whether at stated maturity, upon acceleration or otherwise." Daniels Decl. Ex. A (IDB-IIG Guarantee), § 2.01(a). All payments by IIG were to be made "without any set-off, counterclaim, withholding or condition," *id.* § 2.03, and IIG's obligations under the agreement were not to be "discharged, affected or impaired by any act, omission, circumstance . . . matter or thing which . . . might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor," *id.* § 3.01. More specifically, the IDB-IIG Guarantee stated that this included any "change in the manner, time, or place of payment . . . of the Guaranteed Obligations." *Id.* § 3.01(a).

On May 13, 2011, the IDB-SPV Loan Agreement was amended to, among other things, extend the maturity date to May 15, 2014 (hereinafter "Amend. No. 1 to IDB-SPV Loan Agreement"). *See* Daniels Decl. Ex. D (Amend. No. 1 to IDB-SPV Loan Agreement) at 1, 3. On August 1, 2012 and September 11, 2013, IDB and SPV executed two additional amendments to the IDB-SPV Loan Agreement Amendment. *See* Daniels Decl. Exs. E & F. Neither extended the maturity date. *See generally id.*

3

### 2. 2013: Alleged Oral Promises by IDB to Extend a New Credit Facility

In February 2013, during a meeting between IDB and IIG representatives, IDB allegedly assured IIG that it would extend the maturity date on the IDB-SPV Loan by another five years, from May 15, 2014 to May 15, 2019. *See* Amend. Answer at 17.

That same month, IDB representatives allegedly orally encouraged IIG to enter into an additional loan agreement with OFID, which had been in the works since 2012 as a "co-loan" to attach to the IDB-SPV Loan, for $25 million. *See id.* 17–18. IDB allegedly assured IIG that it would combine the Banks' loans in May 2014 into a single $100 million loan and extend the maturity date on that combined loan by five years. *Id.* at 18.

Allegedly in reliance on IDB's oral representations that it would later extend the loan term, SPV agreed to borrow from OFID. *See id.* At some point in 2013, before the OFID loan closed, IIG allegedly asked IDB whether it should pay down its debt to IDB. *See id.* at 19. IDB indicated that this was not necessary and encouraged IIG to go forward with the OFID loan. *Id.*

### 3. September 2013: The OFID-SPV Loan Agreement and OFID-IIG Guarantee

On September 11, 2013, the same day as the third amendment to the IDB-SPV Loan Agreement, OFID and SPV entered into a $25 million loan agreement (hereinafter "OFID-SPV Loan Agreement."). *See* Daniels Decl. Ex. K (OFID-SPV Loan Agreement) at 1, 19; Amend. Answer at 18. The OFID-SPV Loan Agreement's maturity date was May 15, 2014, *i.e.*, a little more than eight months later and the same as the maturity date for the amended IDB-SPV Loan Agreement. *See* OFID-SPV Loan Agreement at 13; Amend. Answer at 18. The OFID-SPV Loan Agreement provided that, if OFID agreed to a renewal, the maturity date would be extended to May 15, 2015 or May 15, 2016. OFID-SPV Loan Agreement at 13. Notably,

4

neither the OFID-SPV Loan Agreement nor the third amendment to the IDB-SPV Loan Agreement refers to the alleged oral agreement between the parties.

That same day, OFID and IIG entered into a guarantee agreement (hereinafter "OFID-IIG Guarantee"), whereby IIG "irrevocably, absolutely and unconditionally guarantees to OFID . . . the due and punctual payment of the outstanding principal amount of the Loan made by IDB to [OFID] at any time . . . when due, whether at stated maturity, upon acceleration or otherwise." Daniels Decl. Ex. I (OFID-IIG Guarantee), § 2.01(a). Using the same language as the IDB-IIG Guarantee, all payments by IIG were to be paid without any set-offs or counterclaims, and IIG's obligations under the agreement were not to be "discharged, affected or impaired" by any defenses. *Id.* §§ 2.03, 3.01.

### 4. Late 2013 and Early 2014: Discussions about the Extension of the Maturity Date Continue

On November 13, 2013, following the OFID loan, IIG closed an unrelated transaction, which resulted in an unknown, but presumably substantial, influx of funds. Amend. Answer at 19, 23–24. IIG alleges that it could have used that money to pay down the IDB loan. *Id.* at 19, 24. However, IIG alleges, after further oral assurances from IDB that the loans' deadlines would be extended, IIG used the funds for other purposes and even drew upon the OFID loan. *Id.*

On November 27, 2013, representatives from IIG and IDB met again to discuss the terms of the five-year extension. *See id.* at 19–20. The proposed terms were then communicated to OFID, which did not object to them. *Id.* at 20.

On February 1, 2014, IDB issued a mandate letter indicating that it planned to "lead a financing" totaling $75 million to "provide trade finance for exporting firms in Latin America." *Id.* at 20. A copy of what the Court assumes to be a later draft of that letter, dated February 18, 2014, was attached as Exhibit 1 to the Declaration of Robert S. Landy in support of IIG's

5

opposition to the motion to dismiss. Landy Decl. Exh. 1 at 1. The February 18, 2014 letter "confirms that the bank will consider participating in the senior debt financing of the Project . . . subject to satisfactory results of the Bank's analysis of the Project and satisfaction of the conditions described [t]herein." *Id.* at 2. It also states that the "execution of this Mandate Letter . . . does not represent a commitment on the part of the Bank to provide financing to the Project." *Id.* at 4. It is unsigned.

### 5. May 2014: The Maturity Date is Extended by Two Years

Shortly after issuing the mandate letter, IDB decided against extending or providing new financing to SPV. Amend. Answer at 20. Instead, IDB indicated it would demand full payment by May 2014. *Id.* This, IIG alleges, surprised both IIG and OFID. *Id.* IIG told IDB it would not be able to make the payment. *Id.* IDB then offered to extend both the $75 million loan and $25 million loan for two years, but required "large periodic principal reductions." *Id.*

On May 15, 2014, IDB and SPV executed Amendment No. 4 to the IDB-SPV Loan Agreement. *See* Daniels Decl. Ex. G ("Amend. No. 4 to IDB-SPV Loan Agreement"). This amendment extended the maturity date of the loan to May 15, 2016. *Id.* at 3.

That same day, IDB and IIG executed Amendment No. 1 to the IDB-IIG Guarantee. Daniels Decl. Ex. B ("Amend. No. 1 to IDB-IIG Guarantee") at 1. This amendment included a "Re-Affirmation of Guarantee" that, in pertinent part, stated that IIG's obligations to IDB under the amended guarantee were "free and clear of any set-off, counterclaim or defense on the part of the [IIG]." *Id.* at 5.

On May 19, 2014, OFID and SPV executed Amendment No. 1 to the OFID-SPV Loan Agreement. *See* Daniels Decl. Ex. L ("Amend. No. 1 to IDB-SPV Loan Agreement"). This amendment extended the maturity date of the loan to May 15, 2015, "or, in case OFID Management agrees to the Second Renewal . . . May 15, 2016." *Id.* at 3.

That same day, OFID and IIG executed Amendment No. 1 to the OFID-IIG Guarantee. Daniels Decl. Ex. J ("Amend. No. 1 to OFID-IIG Guarantee") at 1. This amendment also included a "Re-Affirmation of Guarantee," and, in all pertinent parts, contained identical text to the Amendment No. 1 to the IDB-IIG Guarantee. *See id.* at 4. IIG's obligations to OFID under the amended guarantee were "free and clear of any set-off, counterclaim or defense on the part of the [IIG]." *Id.*

On May 14, 2015, OFID and SPV executed Amendment No. 2 to the OFID-SPV Loan Agreement. *See* Daniels Decl. Ex. M ("Amend. No. 2 to IDB-SPV Loan Agreement"). This amendment extended the maturity date of the loan to May 15, 2016. *See id.* at 3.

### 6. 2016: IIG is Unable to Pay the Entire Principal

Following this two-year extension, IIG alleges, it made efforts to meet its new repayment deadline to the detriment of itself and its investors. For example, IIG pressured its investors to repay their loans, sometimes on an accelerated basis, and cancelled "debt facilities it had established for several borrowers." Amend. Answer at 20. This, IIG alleges, caused IIG to lose revenue it would have otherwise received. *Id.* at 21.

Ultimately, however, IIG was unable to repay the principal in full. IIG alleges that it fulfilled its obligations under the amended loan agreements through February 2016 and that it made interest payments in March and May of 2016. *Id.* By the time the May 15, 2016 maturity date passed, however, approximately $18.8 million of the $100 million in debt remained unpaid. *Id.* That debt remains unpaid.

### C. Procedural Background

On December 19, 2016, the Banks filed the above captioned action. Compl.

On February 17, 2017, IIG filed its answer. Dkt. 15 ("Answer"). It recited seven affirmative defenses: (1) failure to state a claim; (2) fraudulent inducement of the $25 million

7

OFID loan; (3) promissory estoppel; (4) *force majeure*; (5) the suit violates IDB's mission; (6) the suit violates OFID's mission; and (7) "[the Banks'] claims are barred by their own wrongful conduct." Answer at 14–16.

On March 10, 2017, IIG filed an amended answer. It reasserted the same affirmative defenses, with minimal modifications, and added an eighth defense of equitable estoppel. *See* Amend. Answer at 14–17. It also added three counterclaims: for (1) fraudulent inducement; (2) negligent misrepresentation; and (3) promissory estoppel. *Id.* at 21–25

On May 1, 2017, the Banks filed a motion to dismiss IIG's counterclaims and to strike IIG's affirmative defenses, and a supporting memorandum of law. Dkt. 33, 35 (collectively, "Motion"). On May 22, 2017, IIG filed a memorandum of law in opposition. Dkt. 37 ("Opp."). On June 1, 2017, the Banks filed a reply. Dkt. 41 ("Reply").

## II. Applicable Legal Standards

### A. Motion to Dismiss

"A motion to dismiss a counterclaim is evaluated under the same standard as a motion to dismiss a complaint." *Orientview Techs. LLC v. Seven For All Mankind, LLC*, No. 13 Civ. 0538 (PAE), 2013 WL 4016302, at *2 (S.D.N.Y. Aug. 7, 2013) (quoting *Revonate Mfg., LLC v. Acer Am. Corp.*, No. 12 Civ. 6017 (KBF), 2013 WL 342922, at *2 (S.D.N.Y. Jan. 18, 2013)). To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.

In considering a motion to dismiss, a district court must "accept[] all factual claims in the complaint as true, and draw[] all reasonable inferences in the plaintiff's favor." *Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 403 (2d Cir. 2014) (quoting *Famous Horse Inc. v. 5th Ave. Photo Inc.*, 624 F.3d 106, 108 (2d Cir. 2010)). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* "[R]ather, the complaint's [f]actual allegations must be enough to raise a right to relief above the speculative level, *i.e.*, enough to make the claim plausible." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (internal quotation omitted).

**B. Motion to Strike**

"Motions to strike affirmative defenses are 'generally disfavored.'" *Grewal v. Cuneo*, No. 13-CV-6836 (RA), 2016 WL 308803, at *4 (S.D.N.Y. Jan. 25, 2016) (citation omitted). For a court to strike an affirmative defense under Rule 12(f), "(1) there must be no question of fact that might allow the defense to succeed; (2) there must be no substantial question of law that might allow the defense to succeed; and (3) the plaintiff must be prejudiced by the inclusion of the defense." *Coach, Inc. v. Kmart Corps.*, 756 F. Supp. 2d 421, 425 (S.D.N.Y. 2010) (quoting *Specialty Minerals, Inc. v. Pluess–Staufer AG*, 395 F. Supp. 2d 109, 111–12 (S.D.N.Y. 2005). When evaluating the first and second prongs, "courts apply the same legal standard" as a Rule 12(b)(6) motion to dismiss. *City of New York v. Fedex Ground Package Sys., Inc.*, 314 F.R.D. 348, 355 (S.D.N.Y. 2016). Courts determine whether a defense is sufficient on the face of the pleadings. Courts assume as true all well-pled facts and draw all reasonable inferences favor of the nonmoving party. *Id.* "In evaluating the third prong, the [courts] may consider whether inclusion of the legally insufficient defense would needlessly increase the time and expense of

9

trial or duration and expense of litigation." *Id.* (internal quotations omitted). "The burden of additional discovery and increasing the duration and expense of litigation can constitute sufficient prejudice." *Colonial Funding Network, Inc. for TVT Capital, LLC v. Epazz, Inc.*, 252 F. Supp. 3d 274, 287 (S.D.N.Y. 2017) (quoting *Tradewinds Airlines, Inc. v. Soros*, 08 Civ. 5901 (JFK), 2013 WL 6669422, at *2 (S.D.N.Y. Dec. 17, 2013)).

### III. Discussion

#### A. Fraudulent Inducement and Negligent Misrepresentation

In its opposition brief, IIG committed to drop as meritless its counterclaims for fraudulent inducement and for negligent misrepresentation. Opp. at 3 n.2. IIG explained: "Upon further investigation and consideration, IIG-TOF believes that the promises IDB and OFID made before and after September 2013 to establish a new facility that would extend the availability of a $100 million credit facility were made in good faith." *Id.* In recognition of IIG's abandonment of those claims, the Court hereby dismisses those counterclaims.

For the same reason, the Court strikes IIG's affirmative defenses sounding in fraud and negligent misrepresentation. IIG's submission does not attempt to defend these affirmative defense as viable; it is silent as to them. And given IIG's abandonment of the counterclaims paralleling these affirmative defenses and IIG's factual concession that "IDB and OFID fully intended to establish the new facility at the time they promised to do so and had no reason to believe they would not be able to," *id.*, IIG can no longer maintain those affirmative offenses in good faith.

#### B. Promissory Estoppel

The motion to dismiss IIG's counterclaim of promissory estoppel, and to strike IIG's affirmative defense of the same, merit more extended discussion. The Banks argue that these should be dismissed because they are barred by the plain text of the unconditional guarantees.

10

IIG argues that they are not. Applying governing New York law,[3] the Banks' argument is the more persuasive.

Under New York law, guarantee agreements are interpreted according to traditional principles of contract law. *Cooperatieve Centrale Raiffeisen-Boerenleenbank, B.A. v. Navarro*, 36 N.E.3d 80, 85 (N.Y. 2015). If a guarantee was entered into voluntarily and is "complete, clear, and unambiguous," it is enforced "according to the plain meaning of its terms." *Id.* "Th[is] rule reflects the notion that when parties have expressly allocated risks, the judiciary shall not intrude into their contractual relationship." *Citicorp Leasing, Inc. v. United Am. Funding, Inc.*, No. 03 Civ. 1586 WHP, 2005 WL 1847300, at *4 (S.D.N.Y. Aug. 5, 2005) (internal quotation omitted).

An unconditional guarantee is a particular type of guarantee "that contain[s] language obligating the guarantor to payment without recourse to any defenses or counterclaims." *Cooperatieve*, 36 N.E.3d at 85 (N.Y. 2015). When, in an action to enforce an unconditional guarantee, guarantors bring counterclaims or assert affirmative defenses, courts regularly dismiss and strike those counterclaims and defenses. *See, e.g., JP Morgan*, 2012 WL 12925172, at *3; *Overseas Private Inv. Corp. v. Furman*, No. 10 Civ. 7096 (RJS), 2012 WL 967458, at *11 (S.D.N.Y. Mar. 14, 2012); *Citicorp*, 2005 WL 1847300, at *5; *United Bank of Africa, P.L.C. N.Y. Branch v. Odimayo*, No. 93 CIV. 3998 (WK), 1994 WL 185826, at *3–4 (S.D.N.Y. May 10,

---

[3] The applicable law here is New York's: Both guarantee agreements contain a choice-of-law provision that selects New York law, *see* IDB-IIG Guarantee § 6.06(a); OFID-IIG Guarantee § 6.06(a), and all parties treat New York law as governing, *see Fed. Ins. Co. v. Am. Home Assur. Co.*, 639 F.3d 557, 566 (2d Cir. 2011) ("[W]here the parties agree that New York law controls, this is sufficient to establish choice of law."); *Prince of Peace Enterprises, Inc. v. Top Quality Food Mkt., LLC*, 760 F. Supp. 2d 384, 397 (S.D.N.Y. 2011).

1994); *Cooperatieve*, 36 N.E.3d at 85–86 (collecting cases); *SCP (Bermuda) Inc. v. Bermudatel Ltd.*, 224 A.D.2d 214, 215 (N.Y. App. Div. 1996).

The unconditional guarantees that the courts have enforced, finding asserted defenses or counterclaims to be contractually unavailable, have two common features.

First, the text of such guarantees explicitly state that they are absolute and unconditional. *See, e.g., Overseas Private*, 2012 WL 967458, at *2 ("The obligations of the Guarantor under this Guaranty are direct, absolute, unconditional, and irrevocable . . . ."); *Odimayo*, 1994 WL 185826, at *1 ("This Guaranty shall be construed as a continuing, absolute, and unconditional guaranty of payment . . . ."); *Citicorp*, 2005 WL 1847300, at *1 (defendants' obligations are fixed "unconditionally, absolutely, and irrevocably . . . irrespective of . . . the genuineness, validity or enforceability of [the Loan Agreements].").

Second, the text of such guarantees almost always contains language explicitly waiving all claims and/or defenses. *See, e.g., Overseas Private*, 2012 WL 967458, at *2 ("The obligations of the Guarantor . . . shall not to any extent or in any way be reduced, limited, terminated, discharged, impaired, or otherwise affected by . . . any right, claim or defense . . . ."); *Citicorp*, 2005 WL 1847300, at *2 (defendants had waived their "right to interpose any counterclaim"); *SCP (Bermuda) Inc.*, 224 A.D.2d at 215. It is not clear that a waiver of both counterclaims and defenses is necessary to work such a waiver. In *JP Morgan*, for example, the waiver referred only to defenses, but a court in this District held that both affirmative defenses and counterclaims had been waived. *See* 2012 WL 12925172, at *3.[4]

---

[4] In at least one case, a waiver of the guarantor's personal defenses was found without an explicit reference to them in the guarantee. *See Goodridge*, 728 F. Supp. at 285–86 ("Most important to the [New York Court of Appeals'] holding in [*Citibank v. Plapinger*, 485 N.E.2d 974, 977 (N.Y. 1985)] was that the guarantee by its own terms was 'absolute and unconditional'; that the

12

In some instances, the waiver provisions have gone further, referring more specifically to the types of defenses and counterclaims that are precluded. For example, in the guarantee at issue in *Citicorp Leasing, Inc.*, *supra*, the defendants had "consent[ed] that from time to time, without notice to or further consent from [defendants] and without releasing or affecting [their liability under the Guarantees] . . . the provisions of any documents may be cancelled, compromised, modified or waived." *Citicorp*, 2005 WL 1847300, at *6. A court in this District held such language to bar the defense that the plaintiffs had impermissibly and unilaterally modified the loan agreement. *Id.* At the same time, it held precluded other defenses (fraud and unclean hands) notwithstanding the lack of any contractual provision explicitly denoting them as waived. *Id.* at *7. *See also JP Morgan*, 2012 WL 12925172, at *1, *3 (dismissing counterclaims based on general disclaimer provision and provisions that stated that the guarantee could be discharged only by "full, final and irrevocable payment" of the loan).

The guarantees at issue here contain each of the features commonly held to preclude counterclaims and defenses, including that of promissory estoppel.

First, as noted, IIG guaranteed due and prompt payment to both IDB and OFID "irrevocably, absolutely and unconditionally." IDB-IIG Guarantee § 2.01(a); *see also* OFID-IIG Guarantee § 2.01(a).

Second, in the initial guarantee agreements, IIG explicitly waived all defenses and stated that all payments must be made "without any set-off, counterclaim, withholding or condition." IDB-IIG Guarantee § 2.03; *see also* OFID-IIG Guarantee § 2.03.

---

guarantee also stated that this was so irrespective of other possible defenses was merely additional support for the decision," *id.* at 286).

13

Third, in addition to that broad waiver, the guarantees also contain a more specific waiver applicable to IIG's promissory estoppel counterclaim. They state that IIG cannot use as a defense any "change in the manner, time or place of payment . . . of the Guaranteed Obligations," IDB-IIG Guarantee § 3.01(a); *see also* OFID-IIG Guarantee § 3.01(a), which in turn are defined as "the due and punctual payment of the outstanding principal amount of the [Loans]," IDB-IIG Guarantee § 2.01(a); *see also* OFID-IIG Guarantee § 2.01(a). Because the promissory estoppel counterclaim is based entirely on alleged oral representations about extending, or "changing," the time of payment and the terms, or "manner," of that extension, § 3.01 squarely precludes that counterclaim here.

Fourth, the contractual documents here have an additional feature pointing to preclusion—one not present in the precedents reviewed above: voluntary post-guarantee waivers, by the party now attempting to bring a counterclaim or defense, of all counterclaims and defenses, made after the events giving rise to the counterclaims at issue. On May 14 and 19, 2015, after the claim of promissory estoppel allegedly "accrued" and the "damage was done," Opp. at 19, IIG signed amendments that cover the same activity as the alleged oral agreement that forms the basis of IIG's counterclaims: the extension of the payment period for the IIG-SPV Credit Facility and OFID-SPV Loan. Those amendments explicitly reaffirmed IIG's obligations. And, significant here, they stated that IIG's obligations were "free and clear of any set-off, counterclaim or defense on the part of the Guarantor."

To be sure, the specific formulation of this clause—insofar as it prefaces the waiver provision with the clause "free and clear"—appears novel in the reported case law. The parties have not directed the Court to any case involving a guarantee using that precise formulation. But the plain text of that provision makes clear its meaning: that the enforceability of IIG's

14

guarantees are to be unimpeded by any asserted counterclaim or defense. The Merriam-Webster dictionary, for example, defines (as relevant here) "free" as "exempt, relieved, or released," and "clear" as "free from obstruction, burden, limitation, defect, or other restricting features: such as . . . free from qualification or limitation."[5] And the dictionary definitions of the phrase "free and clear," although keyed to the context in which this term of art is most commonly used—a lien-free transfer of property—are in accord insofar as they also connote the lack of any encumbrance or barrier to the purchaser's exclusive title and ability to market the property in question.[6] It follows that, under the May 2015 amendments, IIG's obligations are "exempted," "relieved" or "released" from "qualifications" or "limitations"—explicitly including counterclaims and defenses. That IIG explicitly disclaimed counterclaims and defenses at a time when it was aware of the facts it now alleges in support of its current claim of promissory estoppel makes the claim of waiver here particularly strong. *Cf. Graubard Mollen Dannet & Horowitz v. Edelstein*, 173 A.D.2d 230, 231 (N.Y. App. Div. 1991) (finding that execution of agreement acknowledging indebtedness after guarantor was aware of fraud constituted a waiver of the defense of fraudulent

---

[5] *See Free*, Merriam-Webster Online, http://unabridged.merriam-webster.com/unabridged/free (last visited November 27, 2017); *Clear*, Merriam-Webster Online, http://unabridged.merriam-webster.com/unabridged/clear (last visited November 27, 2017).

[6] Merriam-Webster defines "free and clear" as "without liens or other legal claims." *Free and Clear*, Merriam-Webster, http://unabridged.merriam-webster.com/unabridged/free%20and%20clear (last visited December 4, 2017); and Black's Law Dictionary defines "free and clear" as "[u]nencumbered by any liens." *Free and Clear*, Black's Law Dictionary (10th ed. 2014). The term is commonly used in the context of the sale of real estate, in which a purchaser has a right to a marketable title, to "hold the land free from a probable claim by another." 91 Paul M. Cotloff, et al., N.Y. Jur. 2d *Real Property Sales and Exchanges* § 109 (2017). It is used, too, in the context of bankruptcy proceedings, in that, following a "free and clear" sale, the bankruptcy court "can enjoin the creditor from suing to enforce a preexisting lien," 4A Fed. Proc. Forms § 9B:563, and the purchaser may be free of successor liability for other preexisting claims, 2 Bankruptcy Law Manual § 15:14 (5th ed. 2017).

inducement). The Court has no hesitation enforcing as written this bargain between sophisticated entities.

In arguing to the contrary, IIG seeks to distinguish its guarantees from those enforced in other cases not by developing a coherent textual interpretation of the commitment it undertook, but by proposing a distinction. It proposes that although guarantees that procedurally bar the interposition of counterclaims must be enforced, counterclaims should survive where the guarantees are properly read to provide "substantive protection regarding the enforceability of the 'Guarantor's obligations,' notwithstanding the existence of valid counterclaims." Opp. at 11. But that is not what the multiple writings in which IIG foreswore such counterclaims or defenses say. And IIG has not cited, and the Court has not found, any case law preserving counterclaims or defenses in the face of contract language akin to that here.

On the contrary, the decisions in, among other cases, *JP Morgan* and *Overseas Private Investment Corp.*, are inconsistent with the preservation of counterclaims alongside the enforceability of a guarantee. The guarantee in *JP Morgan* provided that:

> [Defendant] hereby agrees that this Guarantee is a continuing guarantee and that its obligations hereunder shall be absolute and unconditional, irrespective of the value, validity or enforceability of the [Loan] and, to the fullest extent permitted by applicable law, irrespective of any other circumstance whatsoever that might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor in its capacity as such . . . .

2012 WL 12925172, at *1. It further provided that the guarantee could not be discharged except by "full, final and irrevocable payment" of the loan. *Id.* The Guarantee in *Overseas Private* similarly provided that:

> The obligations of the Guarantor under this Guaranty are direct, absolute, unconditional, and irrevocable and shall not to any extent or in any way be reduced, limited, terminated, discharged, impaired, or otherwise affected by . . . any right, claim or defense . . . that the Guarantor may have under or in respect of this Guaranty or otherwise.

16

2012 WL 967458, at *2. The courts in those cases held not merely that the guarantee was unconditional, but that the guarantor's counterclaims were barred. *JP Morgan*, 2012 WL 12925172, at *3 (also barring defenses); *Overseas Private*, 2012 WL 967458, at *7–9.

IIG separately has suggested that the 2013 OFID Loan and the 2014 amendments were entered into involuntarily. But on the circumstances here, those arguments fail. A rare instance in which an unconditional guarantee may not be enforced is where there was fraud in the inducement of the guarantee itself. *See Manufacturers Hanover Tr. Co. v. Yanakas*, 7 F.3d 310, 317–18 (2d Cir. 1993). *But see JP Morgan*, 2012 WL 12925172, at *3 (If the guarantee agreement "contains an explicit disclaimer of all defenses based on the Guarantee itself," the defendant is "foreclosed from asserting defenses based on the validity of the decree."). Here, however, as noted, IIG has now repudiated any claim of fraudulent inducement in the 2013 OFID Loan, and has never claimed fraudulent inducement as to the 2014 amendments.

IIG's pleadings further imply a claim of economic duress as to the 2014 amendments. Specifically, IIG posits that in 2013, following IDB's assurances that its and OFID's loans would be extended by five years, IIG expended cash it would otherwise have used to pay down the IDB loan and drew down the OFID loan; that, later, in 2014, when IDB reversed its position on the extension of its loan and demanded full payment, IDB put IIG in an impossible economic position that IIG would not have been in absent its reliance on IDB's earlier promises; and that in early May 2014, when IIG was facing default on its loan obligations, IDB forced IIG to sign under "duress and legal compulsion" a shorter and otherwise less favorable loan extension than previously promised and an amended guarantee. Amend. Answer at 19–20. But those claimed circumstances of "duress" at the time the extensions were signed do not provide IIG a basis for relief from its guarantees. A guarantor that can prove its unconditional guarantee was entered

17

into under duress can avoid its enforcement. *See Dunkin' Donuts of Am., Inc. v. Liberatore*, 138 A.D.2d 559, 560 (N.Y. 1988); *Columbus Tr. Co. v. Campolo*, 110 A.D.2d 616, 617 (N.Y. App. Div. 1985). But even if IIG could validly claim duress at of the time it signed the 2014 amendments of its guarantees—and on the pleadings IIG's claim of duress is tenuous at very best—any such defense would fail here. That is because a party claiming duress must disclaim the contract promptly or else it forfeits any claim of duress. *VKK Corp. v. Nat'l Football League*, 244 F.3d 114, 122–23 (2d Cir. 2001); *Orix Credit All., Inc. v. Bell Realty, Inc.*, No. 93 CIV. 4949 (LAP), 1995 WL 505891, at *5 (S.D.N.Y. Aug. 23, 1995). "Delays as short as six months have been held to constitute forfeiture of the claim." *VKK Corp.*, 244 F.3d at 123; *see also Oquendo v. CCC Terek*, 111 F. Supp. 3d 389, 410 (S.D.N.Y. 2015) (eight months late); *2 Broadway LLC v. Credit Suisse First Boston Mortgage Capital LLC*, No. 00 Civ. 5773, 2001 WL 410074, at *12 (S.D.N.Y. Apr. 23, 2001) (10 months late). Here, IIG waited a full two years after the contract extension, plus an eight additional months until the Banks brought their case, to claim duress. And in the meantime SPV made payments under the loan. *See Orix Credit*, 1995 WL 505891, at *5 (finding primary obligor's eight repayments under the loan constituted ratification). Any counterclaim IIG might have had based on duress is therefore deemed waived, and the guarantee may not be voided on such grounds. It is instead enforceable against IIG and bars IIG's promissory estoppel counterclaim.

The same is so of IIG's affirmative defense of promissory estoppel, because the standard to strike an affirmative defense, while stricter than the standard to dismiss a counterclaim, is met here. To strike such a defense, the Court must find that (1) there is no substantial question of law that might allow the defense to succeed, (2) there is no substantial question of fact that might

allow the defense to succeed, and (3) the plaintiffs will be prejudiced if the Court permits the defense to remain. *Coach*, 756 F. Supp. 2d at 425.

These elements are easily resolved in the Banks' favor. First, for the reasons above, the promissory estoppel defense fails as a matter of law. Second, IIG has not alleged facts that would permit the defense to succeed, and the factual claims that in theory might be available to a guarantor are, in any event, unavailable to IIG here: It has explicitly waived any claim that the 2014 guarantees were a product of fraudulent inducement, and, through its delay, it has waived any claim of duress. Finally, the Banks would be prejudiced by maintaining the affirmative defense of promissory estoppel. As the Court and parties reviewed at the initial conference in this case on April 14, 2017, the cost of discovery as to the promissory estoppel claim would likely be substantial. Were this claim allowed to stand notwithstanding its legal and factual deficiencies, litigation as to it would almost certainly require heavy document discovery followed by deposition discovery not merely as to the events immediately surrounding the 2014 amendments, but also in all likelihood, the parties' entire six-year relationship. In time and cost, this review would impose a punishing burden on the parties and delay considerably this litigation over the enforcement of a guarantee, prejudicing the parties seeking the guarantees' enforcement. *See Colonial Funding Network*, 252 F. Supp. 3d at 287; *S.E.C. v. McCaskey*, 56 F. Supp. 2d 323, 326–27 (S.D.N.Y. 1999).

### C. Remaining Affirmative Defenses

The Court also strikes four of the five remaining affirmative defenses as stated by IIG: (1) *force majeure*; (2) IBD's and OFID's violation of their own missions; (3) equitable estoppel; and (4) that IDB and OFID's claims are "barred by their own wrongful conduct" (apparently an unclean hands defense). The same guarantee provisions above make these defenses untenable, and IIG, in its opposition brief, notably does not defend them.

19

The Court, however, does not strike IIG's affirmative defense that the Banks fail to state a claim. "It is well settled . . . that a failure-to-state-a-claim defense can properly be asserted as an affirmative defense in an answer." *Coach*, 756 F. Supp. 2d at 432; *see also S.E.C. v. Toomey*, 866 F. Supp. 719, 723 (S.D.N.Y. 1992). "[A] failure-to-state-a-claim defense is not vulnerable to motions to strike because the defense is analogous to a general denial and its inclusion . . . does not prejudice plaintiffs." *Coach*, 756 F. Supp. 2d at 432; *see also Toomey*, 866 F. Supp. at 723; *Oppel v. Empire Mut. Ins. Co.*, 92 F.R.D. 494, 498 (S.D.N.Y. 1981). In practice, retention of this affirmative defense is unlikely to affect the course of this litigation, as litigating it is likely to be redundant of litigation over the Banks' affirmative case.

## CONCLUSION

For the reasons above, the Banks' motion to dismiss all counterclaims is granted, as is the Banks' motion to strike all affirmative defenses except for IIG's defense that the Banks failed to state a claim. The Clerk of Court is respectfully directed to terminate the motion pending at Dkt. 33. The Court directs counsel to meet and confer and, within one week of this decision, to submit a joint letter setting forth the parties' views as to the future direction of this case.

SO ORDERED.

*Paul A. Engelmayer*
Paul A. Engelmayer
United States District Judge

Dated: December 4, 2017
      New York, New York